IN RE APPEAL OF JESSE BAILEY, JR.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued October 8—decided November 6, 1969

*Nicholas A. Cioffi,* special public defender, with whom was *Lawrence L. Hauser,* for Marian Bailey.

*Richard E. Rapuano,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the state.

KING, C. J. On August 30, 1967, Jesse Bailey, Jr., a fifteen-year-old boy born June 1, 1952, was adjudicated a delinquent child in the Juvenile Court for the first district and was committed to the Connecticut School for Boys, located at Meriden and hereinafter referred to as Meriden. No claim is made that this original commitment, which was made pursuant to § 17-406 of the General Statutes (Rev. to 1968), was in any way unauthorized, unlawful or constitutionally defective.

Thus, in this appeal we are concerned only with a subsequent order of the Juvenile Court entered on May 23, 1968, transferring Jesse to the Connecticut Reformatory, a correctional institution for boys under twenty-one years of age which is located in Cheshire and hereinafter is referred to as Cheshire.

Pursuant to § 18-77 of the General Statutes (Rev. to 1968), an application was made to the Juvenile Court by the trustees of Meriden for the transfer of Jesse to Cheshire. It is important to note that under Connecticut law no "administrative transfer" from Meriden to Cheshire is permitted, thus differentiating this case from cases such as *Shone* v. *State,* 286 F. Sup. 511, 513 (D. Me.); *In re Rich,* 125 Vt. 373, 378, 216 A.2d 266; or *United States ex rel. Stinnett* v. *Hegstrom,* 178 F. Sup. 17, 20 (D. Conn.), involving similar, but purely administrative, transfers. In the instant case, a full hearing was held in the Juvenile Court on the transfer issue on May 23, 1968, as is shown by the transcript, which also indicates that Jesse and his mother were given ample notice and were represented by counsel and that each was given the opportunity of confrontation and cross-examination. See General Statutes (Rev. to 1968) §§ 17-66, 17-66a, 17-66b, 17-66c, 17-66d, 17-67.

Actually, at the hearing, Jesse chose to take the stand and testified in substantial accordance with the claims of the attorney general, who appeared in favor of the granting of the petition for transfer. Incidentally, it should be pointed out that in Connecticut the duties of the attorney general do not embrace criminal proceedings. General Statutes (Rev. to 1966) § 3-125.

The court found that Jesse ran away from Meriden on a number of occasions, on one of which he was involved in the taking of an automobile without the owner's permission (General Statutes [Rev. to 1966] § 14-229); that, while supposedly confined in Meriden in the treatment unit (which the transcript indicates has several rooms in which unruly inmates may be kept in locked confinement), he succeeded in getting out and assaulted a staff member, inflicting injuries requiring hospitalization for about a month; that Meriden has no facilities adequate for containing a boy, such as Jesse, who persists in running away and refuses to respond to discipline or to cooperate in the school's program of rehabilitation; that consequently the school could no longer serve Jesse's needs; and that his conduct there placed in jeopardy other inmates and the staff of the school and so disrupted the school as materially to interfere with, and impair, its ability to rehabilitate the other inmates. From these and other similar facts, the court drew the ultimate conclusion that "the best interest of Jesse Bailey requires that he be placed in an institution with a more structured and secure setting for his own benefit and for the benefit of the community in order to enable him to receive the education and training that he is entitled to, and [that] the Connecticut Reformatory is such an institution."

From the order of transfer of the Juvenile Court, this appeal was taken to the Superior Court under §§ 17-70 and 17-70a of the General Statutes (Rev. to 1968). It should be noted that counsel on the appeal was appointed for Jesse upon a proper affidavit of indigency and that a timely and ample order of notice was issued by the Juvenile Court, including notice to Jesse, his attorney and his mother.

For convenience, Jesse is referred to herein as the appellant, although his mother is actually the named appellant. The only specific complaints made in his brief are (1) that he did not have a public hearing, although his mother was present with his attorney, and (2) that he was not given a jury trial. Nothing is said in Jesse's brief about the quantum of proof, although it is clear from the reservation that the Juvenile Court applied the civil rule of fair preponderance of the evidence rather than the criminal rule of proof beyond a reasonable doubt.

Instead of trying the appeal in the Superior Court, the appellant and the attorney general united in requesting the Superior Court to reserve for this court, on an agreed statement of facts, a stated question "because the only reason of appeal to the Superior Court involves this question of constitutionality as to § 17-394 [later § 18-77], Connecticut General Statutes." The Superior Court granted the foregoing request for reservation.

The question reserved is stated as follows: "Is Section 17-394 [§ 18-77] of the Connecticut General Statutes, as amended, unconstitutional for the alleged reason that it violates due process of law and allows incarceration in a penal institution without first having a conviction of a crime?"

To avoid possible misunderstanding, it perhaps should be pointed out that the General Assembly,

in the 1969 session, made very substantial changes in many of the statutory provisions involved in this appeal. See Public Acts 1969, Nos. 483, 664, 794. Much of what is said in this opinion, and many of the references to statutes, necessarily will be affected by the 1969 changes. Probably the most important change, as far as this proceeding is concerned, is the repeal of the transfer statute (§ 18-77) which is the statute the constitutionality of which Jesse is attacking. This repeal was effected by § 18 of No. 664 of the Public Acts of 1969.

We were informed by counsel in argument that Jesse is now at home with his mother on parole from Cheshire. Since he is now over seventeen, he has long since passed from the exclusive original jurisdiction of the Juvenile Court (General Statutes [Rev. to 1968] § 17-59), and, if he indulges in any criminal misconduct, he will be amenable to ordinary criminal procedures, which will accord him the right to a public jury trial. Since he is still, however, on parole from Cheshire, this appeal is technically not moot, however useless it may appear as a practical matter as far as Jesse is concerned. *Whiteside* v. *Burlant,* 153 Conn. 204, 206, 215 A.2d 100; *Sibron* v. *New York,* 392 U.S. 40, 50, 88 S. Ct. 1889, 20 L. Ed. 2d 917; see also note, 9 A.L.R.3d 462, 493 § 10. In the first place, it is to be hoped that his conduct on parole will be good. But if he engages in further criminal misconduct, technically he might, on conviction, have to serve some further time in Cheshire under his present commitment.

Consequently, we consider the question reserved although, for reasons hereinafter pointed out, the reservation is inadequate for us to determine that question.

A reading of Jesse's brief shows that his claim is

that the order of transfer amounted to an order for his commitment to Cheshire; that Cheshire is a penal institution; and that a person cannot constitutionally be confined in a penal institution without a conviction of a crime after a proceeding conducted in accordance with the constitutional requirements for a criminal trial.

As previously pointed out, the appeal does not question the constitutionality of Jesse's original commitment to Meriden, since Jesse agrees that Meriden is not a penal institution. See cases such as *Nieves* v. *United States,* 280 F. Sup. 994 (S.D. N.Y.). It is true, as Jesse claims, that Juvenile Court procedure is essentially civil in nature, as was early recognized in our own case of *Cinque* v. *Boyd,* 99 Conn. 70, 84, 121 A. 678. That theory was recently recognized by the Supreme Court of the United States in *In re Gault,* 387 U.S. 1, 30, 87 S. Ct. 1428, 18 L. Ed. 2d 527, and in the slightly earlier case of *Kent* v. *United States,* 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84. It is on this, the parens patriae basis, that certain of the informalities of Juvenile Court procedure have been held constitutionally permissible. See also *In re Whittington,* 391 U.S. 341, 344, 88 S. Ct. 1507, 20 L. Ed. 2d 625.

We turn now to Jesse's primary and basic claim, which is that, when he was transferred from Meriden to Cheshire, he was transferred from a custodial institution to a penal institution.

Whether this is so depends on whether the Connecticut Reformatory is in fact a penal institution. Unless it is, Jesse's whole argument falls. And it is elementary that in this proceeding the burden of proving that Cheshire is a penal institution, as to Jesse, is on him, since the unconstitutionality of a statute is not to be presumed.

The statement of facts in the reservation contains nothing about the character of Cheshire, its facilities, or how it handles transferees from Meriden such as Jesse. It contains no facts on which we could hold that it is a penal institution, nor did the Juvenile Court find any such facts. It is thus not surprising that Jesse does not in his brief base his claim that Cheshire is a penal institution on anything in the statement of facts. Rather, he predicates that claim on certain statutory provisions, particularly §§ 18-73, 18-75 and 18-77 of the General Statutes (Rev. to 1968).[1] The attorney general strenuously contends that Cheshire is not a penal institution as to Jesse. Thus we are confronted with a reservation which is factually inadequate for a determination of the question reserved unless, as Jesse claims, he can establish from the statutes themselves that Cheshire is a penal institution.

Meriden is described in § 17-402 of the General Statutes (Rev. to 1968) as an institution "established to provide training for socially maladjusted boys and shall function both as an educational and as a child welfare institution." Jesse, in his brief, agrees that under this statute, and since Meriden is under the supervision and jurisdiction of a board of

[1] "Sec. 18-77 (Formerly Sec. 17-394). TRANSFER FROM CONNECTICUT SCHOOL FOR BOYS. Any inmate of the Connecticut School for Boys, between the ages of fourteen and twenty-one years, whom the trustees of said institution desire to have transferred to the reformatory shall, upon a hearing and order of the judge of the juvenile court for the district from which such inmate was sent to said school for boys, be transferred to the reformatory and such inmate shall be received by the superintendent. Offenders of this class may be detained at the reformatory for the same period for which, except for their transference to said reformatory, they could have been held at said school for boys. Any person so transferred to the reformatory shall be subject to the control, rules and regulations of the commissioner of correction."

trustees not connected with any other state agency (General Statutes §§ 17-403, 17-404), Meriden is not a penal institution.

There is no corresponding statute describing Cheshire, but §§ 18-70 and 18-71 indicate that some sort of vocational training is provided there. In § 18-99 the jails and Cheshire and Meriden are all treated as substantially the same with respect to transfers of inmates to a newly created forest camp first authorized by No. 651 of the Public Acts of 1967.

Jesse's claim that Cheshire is a penal institution is based on three main statutory grounds. The first ground is that under § 18-75 criminals may be sentenced to Cheshire by the Circuit Court and under § 18-73, by the Superior Court, while the Juvenile Court cannot directly commit a delinquent child to Cheshire (as distinguished from Meriden) except in a transfer ordered under the provisions of § 18-77, as was done here.

Although the Superior Court under § 18-73 is authorized to order commitment to Cheshire upon the conviction of a crime, such commitment is authorized if, but only if, the Superior Court finds that the convict "appears . . . to be amenable to reformatory methods". No such restriction governs commitments to jail or prison. This alone clearly indicates that the reformatory is significantly different, as its name implies, and in its "methods" of rehabilitation, from a jail or prison. The distinction further appears in the age limitation restricting commitments to Cheshire to male persons between the ages of sixteen and twenty-one, except that under § 18-77 a transferee from Meriden need be only fourteen. No maximum age restriction applies to jails and prisons. The transfer statute (§ 18-77) under which the court acted in the present case limits the time in which a

transferee can be held in Cheshire not only to his minority (§ 17-69) but also to the time for which, but for the transfer, he could have been held in Meriden. We find nothing here which makes it clear that Cheshire is a penal institution such as a jail or prison.

Jesse makes much of the fact that under § 18-78 a department of correction was established in 1967 which is given jurisdiction over prisons, jails and Cheshire, but not over Meriden. We see little force in this claim. Prior to the establishment of the department of correction by No. 152 of the Public Acts of 1967, both Meriden and Cheshire were classified as "Reformatory Institutions" and were included in chapter 309 of the Connecticut General Statutes, Revision of 1958, as part of Title 17, entitled "Humane and Reformatory Agencies and Institutions". Included in this title were state institutions for mentally deficient persons and numerous other institutions which by no stretch of the imagination could be called penal institutions. In the same 1958 Revision, under Title 18, entitled "Penal Institutions", were state prisons and jails. Thus, as far as titles were concerned, Cheshire was not treated as a penal institution but as a reformatory institution, as was Meriden. When the department of correction was established in 1967, many statutes were amended as incidental to the creation of the new department. Reformatory institutions and penal institutions were alike gathered together and placed under Title 18, which was changed from "Penal Institutions" to "Correctional Institutions and Department of Correction". See volume IV of the General Statutes (Rev. to 1968), Title 18. The Long Lane School (for girls) and Meriden were retained in Title 17 as "Reformatory Institutions."

No facts or statutory amendments showing any significant change in the actual operation or character of either Meriden or Cheshire were even claimed, and we cannot transmute Cheshire from a reformatory institution into a penal institution merely because it was placed under the new department of correction. Indeed, Cheshire was still entitled "Connecticut Reformatory" in chapter 324 of the General Statutes (Rev. to 1968). The mere fact that the commissioner of corrections is given jurisdiction over the reformatory and also over jails and prisons falls short of persuasive evidence that the reformatory is a penal institution. The most which can be said is that, subject to the limitations previously noted, some youthful convicts can be, and presumably are, directly committed to the reformatory by the Superior and Circuit Courts. It was apparently on this last ground that Cheshire was stated to be a "Penal Institution" in a comprehensive article on Connecticut Juvenile Court practice and procedure appearing in 41 Connecticut Bar Journal, 201, 254. Indeed, the repeal of § 18-77 may well have resulted from the recommendation to that effect made on page 255 of the same article. See also an article on the interinstitutional transfer of juveniles in 20 Maine Law Review, 93.

Whether such convicts so directly committed are treated in the same way as persons who are transferred from Meriden under § 18-77 does not appear. Nor is there anything to indicate whether they are segregated from transferees from Meriden. See cases such as *United States ex rel. Stinnett* v. *Hegstrom,* 178 F. Sup. 17, 20 (D. Conn.). It is perfectly possible for one institution to be departmentalized and its inmates segregated into divisions. See cases such as *Sheehan, Petitioner,* 254 Mass. 342, 345, 150

N.E. 231. As far as any facts before us indicate, that may well have been the case here.

Jesse also makes much of the provisions of § 18-87 of the General Statutes (Rev. to 1968) authorizing the commissioner of correction to "transfer any inmate of any of the institutions of the department to any other appropriate state institution when the warden, superintendent or jail administrator believes that the welfare or health of the inmate requires it." From this provision he argues that the commissioner of correction might administratively transfer Jesse from the reformatory to the state prison or to jail, either of which clearly is a penal institution. If we assume, without deciding, that the broad language of § 18-87 would be applicable to such a proceeding, where the petitioner had been transferred from Meriden to Cheshire, as was Jesse, by order of the Juvenile Court, and under the limitations on the period of confinement hereinbefore referred to, the validity of such an administrative transfer would be open, in Jesse's case, to a much stronger constitutional attack than he is now able to make. See *In re Whittington,* 391 U.S. 341, 344, 88 S. Ct. 1507, 20 L. Ed. 2d 625. In any event, there is no threat of any such proceeding, and, as already noted, Jesse is on parole from Cheshire and is living with his mother in their own home. We cannot find that the mere fact that § 18-87 purports to permit such a transfer to jail or to prison is substantial evidence that the reformatory itself is a penal institution. And that is the question presented by the reservation now before us.

In other words, it is the actual character of Cheshire in its relation to Jesse which determines whether or not it is a penal institution. The United States Supreme Court has made it clear that actual-

ities, not names or titles, must determine the character of an institution. *In re Gault,* 387 U.S. 1, 27, 87 S. Ct. 1428, 18 L. Ed. 2d 527.

In *State ex rel. Londerholm* v. *Owens,* 197 Kan. 212, 222, 416 P.2d 259, a case on which Jesse especially relies, there was detailed testimony as to the facilities and operation of the industrial reformatory from which the court was able to determine that it was a penal institution. In *In re Rich,* 125 Vt. 373, 377–78, 216 A.2d 266, the other case principally relied upon, it was pointed out that the Vermont House of Correction was defined by statute to be a branch of the state prison "for the punishment, employment and reformation of men who are convicted of misdemeanors." In neither case was any attempt made, such as Jesse makes here, to induce an appellate court, without any facts, to hold as matter of law that an institution called a reformatory, to which certain youthful convicts could be committed, and which was operated by the same authority which operated jails and prisons, was, regardless of its actual character and method of operation, necessarily a penal institution as to all inmates.

While Jesse himself does not raise the question, we think that it is clear that the Juvenile Court considered Cheshire as having better facilities for containing unruly inmates than had Meriden. But this is not enough for us to hold as matter of law that, although Meriden admittedly is not, Cheshire is, a penal institution. Both appear to provide involuntary confinement for inmates whose conduct requires it.

For the foregoing reasons we cannot conclude that Jesse has proved that Cheshire is a penal institution. Under these circumstances the answer to the question reserved must be in the negative. Conse-

quently, we cannot reach his claim that a public trial or a jury trial, or both, would be required if Cheshire were in fact a penal institution. See note, 100 A.L.R.2d 1241; and *DeBacker* v. *Brainard,* 396 U.S. 28, 90 S. Ct. 163, 24 L. Ed. 2d 60. Obviously either requirement would be wholly incompatible with Juvenile Court procedure.

To the question reserved, for the reasons hereinbefore set forth, we answer "No."

No costs will be taxed in favor of any party.

In this opinion the other judges concurred.