# IN RE JASON C.■
## (SC 16314)

# IN RE GREILY L.■
## (SC 16315)

Norcott, Katz, Palmer, Sullivan and Vertefeuille, Js.**

Argued October 25, 2000—officially released March 27, 2001

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Michael Besso*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman* and *Eliot Prescott*, assistant attorneys general, for the appellant (petitioner commissioner of children and families).

*Robert J. Meredith*, deputy assistant public defender, with whom was *Stacy Violante*, legal intern, for the appellees (respondents).

*Opinion*

NORCOTT, J. These companion cases require this court to determine whether a juvenile's plea of nolo contendere is invalid when the juvenile has not been advised that his or her plea could result in an extension of his or her commitment. The Superior Court for Juvenile Matters, following plea agreements, committed the two juvenile respondents, Jason C. and Greily L., to the department of children and families (department) for eighteen months. During those delinquency commitments, the department, pursuant to General Statutes § 46b-141 (b),[1] filed petitions to extend the respondents' confinement. Both respondents filed motions to dismiss the petitions. The trial court granted the respondents' motions to dismiss the extension petitions on due pro-

---

[1] General Statutes § 46b-141 (b) provides: "The Commissioner of Children and Families may petition the court for an extension of the commitment as provided in subdivision (1) of subsection (a) beyond the eighteen-month period on the grounds that such extension is for the best interest of the child or the community. The court shall give notice to the parent or guardian and to the child at least fourteen days prior to the hearing upon such petition. The court may, after hearing and upon finding that such extension is in the best interest of the child or the community, continue the commitment for an additional period of not more than eighteen months."

cess and double jeopardy grounds. We affirm the judgment of the trial court on due process grounds.

The following facts are relevant to the disposition of these appeals. One appeal brought by the department involves Jason C., a sixteen year old male. In August or September of 1996, Jason C. allegedly committed an act likely to impair the health and morals of a child under the age of sixteen in violation of General Statutes (Rev. to 1995) § 53-21.[2] Pursuant to a plea agreement, the Superior Court for Juvenile Matters adjudicated Jason C. a delinquent on February 10, 1997, following his plea of nolo contendere to the risk of injury to a child charge. The trial court committed Jason C. to the department for a period not to exceed eighteen months.

In March, 1997, prior to his commitment for the risk of injury to a child charge, Jason C. allegedly engaged in sexual conduct with a four year old child in violation of General Statutes § 53a-73a.[3] He appeared before the

[2] General Statutes (Rev. to 1995) § 53-21 provides: "Injury or risk of injury to, or impairing morals of, children. Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[3] General Statutes § 53a-73a provides: "(a) A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age, or (B) mentally defective or mentally incapacitated to the extent that he is unable to consent to such sexual contact, or (C) physically helpless, or (D) less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare, or (E) in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person; or (2) such person subjects another person to sexual contact without such other person's consent; or (3) such person engages in sexual contact with an animal or dead body; or (4) such person is a psychotherapist and subjects another person to sexual contact who is (A) a patient of the actor and the sexual contact occurs during the psychotherapy session, or (B) a patient or former patient of the actor and such patient or former patient is emotionally dependent upon the actor, or (C) a patient or former patient of the actor and the sexual contact occurs by means of therapeutic deception; or (5)

trial court on October 30, 1997, for the adjudication of this charge. Pursuant to a plea agreement, the court again adjudicated Jason C. a delinquent following a plea of nolo contendere to the charge of sexual assault in the fourth degree. Pursuant to the plea agreements of February 10, 1997, and October 30, 1997, the court committed Jason C. to the department for eighteen months, effective October 31, 1997. The trial court did not advise Jason C. during either plea canvass of the possibility that the department could petition for an extension of his commitment. Jason C.'s original delinquency commitment was extended by agreement until October 30, 1999. On October 1, 1999, however, the department again filed a petition, this time seeking to extend the commitment for an additional twelve months.

The other appeal brought by the department involves Greily L., a seventeen year old female.[4] Pursuant to a plea agreement, the Superior Court for Juvenile Matters adjudicated Greily L. a delinquent on April 6, 1998, following her plea of nolo contendere to the charge of violating a court order in violation of General Statutes (Rev. to 1997) § 46b-120.[5] The court committed Greily

such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional; or (6) such person is a school employee and subjects another person to sexual contact who is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor.

"(b) Sexual assault in the fourth degree is a class A misdemeanor."

[4] In addition to the assistant public defender, Greily L. also was represented by a guardian ad litem.

[5] General Statutes (Rev. to 1997) § 46b-120 provides in relevant part: "(5) [A] child may be found 'delinquent' (A) who has violated any federal or state law or municipal or local ordinance, other than an ordinance regulating behavior of a child in a family with service needs as defined in this section or (B) who has violated any order of the Superior Court . . . (10) 'delinquent act' means the violation of any federal or state law or municipal or local ordinance, other than an ordinance regulating the behavior of a child in a family with service needs, or the violation of any order of the Superior Court . . . ."

L. to the department, effective April 9, 1998, for a period not to exceed eighteen months. The trial court did not advise Greily L. during her plea canvass of the possibility that the department could petition for an extension of her commitment. On September 23, 1999, the department filed a petition seeking to extend the commitment for an additional eighteen months.

Jason C. and Greily L. each filed motions to dismiss the extension petitions on November 22, 1999, and December 3, 1999, respectively. They claimed that: (1) the trial court lacked personal and subject matter jurisdiction; (2) granting the petition to extend commitment would violate the plea agreement; (3) the attorney general lacked authority to pursue the petition for extension of commitment; (4) § 46b-141, which permits extension of juvenile delinquency commitments, is void for vagueness; and (5) granting the petition for extension of commitment would violate the prohibition against double jeopardy.

On January 12, 2000, the trial court, in a joint decision, granted each respondent's motion to dismiss the petition to extend commitment based on two grounds. First, the trial court determined that the failure to advise the respondents of a possible extension of delinquency commitment prevented them from entering a knowing and voluntary plea, thereby rendering the plea invalid. Second, the trial court concluded that an extension of delinquency commitment would subject the respondents to a second punishment for the original offense in violation of the constitutional prohibition against double jeopardy. The department appealed from the judgment of the trial court in each case to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).[6]

---

[6] We note that the trial court's dismissal of the petitions to extend the delinquency commitments is a final order for purposes of appeal. See General Statutes § 46b-141 (d).

The department's appeals are limited to the following issues: (1) whether the Superior Court for Juvenile Matters is required, at the time it accepts a plea agreement from a juvenile regarding a delinquency matter, to advise the juvenile of the possibility of an extension of delinquency commitment; and (2) whether an extension of delinquency commitment violates the constitutional prohibition against double jeopardy. We conclude that the trial court is required to advise a juvenile of the possibility that his or her delinquency commitment may be extended beyond the period of time stated in the plea agreement. Because the respondents had not been so advised, their delinquency commitments cannot be extended. Accordingly, we affirm the judgment of the trial court in each case.[7]

The respondents argue that due process requires a trial court, in accepting a plea agreement, to advise a juvenile of possible extensions to the delinquency commitment. Specifically, they claim that the trial court's failure to warn of the possible extension of commitment prevented the respondents from making a knowing and voluntary plea, as mandated by law. The department counters this claim with two arguments. First, it contends that the mere possibility of a commitment extension is a collateral consequence of the plea and, therefore, is too speculative to warrant the requirement of such an advisement. Second, the department argues that the fundamental rehabilitative nature of the juvenile justice system undermines the use of criminal standards in a juvenile setting. We agree with the respondents and conclude that, when accepting a plea agreement, due process requires a court to advise a

---

[7] Because of our conclusion that the respondents did not enter a knowing and voluntary plea in violation of their right to due process, it is not necessary to address the issue of whether an extension of a delinquency commitment violates the constitutional prohibition against double jeopardy. Accordingly, we decline to reach this issue.

juvenile of possible extensions to the delinquency commitment.

## I

An overview of the law governing pleas is necessary for our disposition of this issue. "A plea of guilty or nolo contendere involves the waiver of several fundamental constitutional rights and therefore must be knowingly and voluntarily entered so as not to violate due process. *Boykin* v. *Alabama*, [395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)]; *McCarthy* v. *United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969); *State* v. *Badgett*, [200 Conn. 412, 417–18, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986)] . . . . These constitutional considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . . Under our rules of practice, a trial judge must not accept a plea of nolo contendere without first addressing the defendant personally and determining that the plea is voluntarily made under Practice Book § [39-20][8] and that the defendant fully understands the items enumerated in Practice Book § [39-19].[9] *State* v. *Godek*, [182 Conn. 353, 357, 438 A.2d 114 (1980)] . . . .

---

[8] Practice Book § 39-20 provides: "The judicial authority shall not accept a plea of guilty or nolo contendere without first determining, by addressing the defendant personally in open court, that the plea is voluntary and is not the result of force or threats or of promises apart from a plea agreement. The judicial authority shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the prosecuting authority and the defendant or his or her counsel."

[9] Practice Book § 39-19 provides: "The judicial authority shall not accept the plea without first addressing the defendant personally and determining that he or she fully understands:

"(1) The nature of the charge to which the plea is offered;

"(2) The mandatory minimum sentence, if any;

"(3) The fact that the statute for the particular offense does not permit the sentence to be suspended;

"(4) The maximum possible sentence on the charge, including, if there

"Thus, for a plea to be valid, the record must affirmatively disclose that the defendant understands the nature of the charge upon which the plea is entered . . . Practice Book § [39-19 (1)]; the mandatory minimum sentence, if any; Practice Book § [39-19 (2)]; the fact that a statute does not permit the sentence to be suspended; Practice Book § [39-19 (3)]; the maximum possible sentence; Practice Book § [39-19 (4)] . . . and that the defendant has the right to plead not guilty or to persist in that plea if already made, the right to a trial by a jury or judge, the right to assistance of counsel, the right to confront the defendant's accusers and the right against compelled self-incrimination. . . . Practice Book § [39-19 (5)] . . . . The record must further disclose that the plea is voluntary and not the result of threats or promises. Practice Book § [39-20]." (Citations omitted; internal quotation marks omitted.) *State* v. *Gilnite*, 202 Conn. 369, 381–82, 521 A.2d 547 (1987).

"There is no requirement, however, that the defendant be advised of every possible consequence of such a plea." Id., 383. "Although a defendant must be aware of the direct consequences of a plea, the scope of direct consequences is very narrow. . . . In Connecticut, the direct consequences of a defendant's plea include only the mandatory minimum and maximum possible sentences; Practice Book § [39-19 (2) and (4)]; the maximum possible consecutive sentence; Practice Book § [39-19 (4)]; the possibility of additional punishment imposed because of previous conviction(s); Practice

are several charges, the maximum sentence possible from consecutive sentences and including, when applicable, the fact that a different or additional punishment may be authorized by reason of a previous conviction; and

"(5) The fact that he or she has the right to plead not guilty or to persist in that plea if it has already been made, and the fact that he or she has the right to be tried by a jury or a judge and that at that trial the defendant has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him or her, and the right not to be compelled to incriminate himself or herself."

Book § [39-19 (4)]; and the fact that the particular offense does not permit a sentence to be suspended. Practice Book § [39-19 (3)] . . . . The failure to inform a defendant as to all possible indirect and collateral consequences does not render a plea unintelligent or involuntary in a constitutional sense." (Citations omitted; internal quotation marks omitted.) *State* v. *Gilnite*, supra, 202 Conn. 383 n.17. This court recently summarized the issue of what constitutes a direct consequence when we stated that "our case law clearly and consistently has limited the direct consequences of a guilty plea to those consequences enumerated in Practice Book § 39-19." *State* v. *Andrews*, 253 Conn. 497, 507, 752 A.2d 49 (2000).[10]

This court's decision in *State* v. *Collins*, 176 Conn. 7, 404 A.2d 871 (1978), is relevant to the disposition of this appeal. In *Collins*, the trial court did not inform the defendant until his sentencing that the offenses to which he pleaded guilty would run consecutive to other sentences he was serving. Id., 8. The trial court refused to allow the defendant to withdraw his plea. Id., 9. In reversing the judgment, this court explained that, "[i]n order for a plea of guilty to be constitutionally valid, it

---

[10] The department argues that the distinction between a direct and collateral consequence of a plea often depends on whether the "result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment." *State* v. *Smith*, 207 Conn. 152, 160, 540 A.2d 679 (1988). This court has held, however, that cases citing such a proposition do not "expand the universe of direct consequences of a guilty plea beyond those enumerated in Practice Book § 39-19. . . . [None of those cases has held] that there are direct consequences to a guilty plea other than those enumerated in § 39-19. Indeed, in *Falby* v. *Commissioner of Correction*, [32 Conn. App. 438, 445, 629 A.2d 1154, cert. denied, 227 Conn. 927, 632 A.2d 703 (1993)], the Appellate Court, citing *Sherbo* v. *Manson*, [21 Conn. App. 172, 181, 572 A.2d 378, cert. denied, 215 Conn. 808, 576 A.2d 539 (1990)], recognized that 'Practice Book § [39-19] *defines* the direct consequences' for purposes of determining the validity of a guilty plea." (Emphasis in original.) *State* v. *Andrews*, supra, 253 Conn. 507. Accordingly, we focus our analysis on the factors enumerated in Practice Book § 39-19.

must be *equally* voluntary and knowing . . . . [I]t cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts. . . . An understanding of the law in relation to the facts must include all relevant information concerning the sentence. The length of time a defendant may have to spend in prison is clearly crucial to a decision of whether or not to plead guilty. At the time that the defendant entered his plea of guilty, however, there was no discussion of whether the agreed-upon sentence would run consecutively to or concurrently with any outstanding sentence. Therefore, when the defendant responded at the plea hearing that he had been informed of the maximum penalty provided by law for the offense charged, it is clear that he had not, in fact, been fully apprised of the consequences of his plea." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 9–10. Thus, this court concluded that the plea was not made intelligently. Id., 10.[11]

In the present case, the respondents each entered into a plea agreement with the understanding that they would be committed to the department for a period not exceeding eighteen months. Neither respondent was advised of the possibility that the department could petition for an extension of his or her commitment, an action that would have the effect of extending the time of confinement beyond eighteen months. The trial court's failure to make this advisement stands in stark contrast to Practice Book § 39-19 (4), which requires a

---

[11] It should be noted that this court, in *State* v. *Andrews*, supra, 253 Conn. 508, clarified *Collins*. The court explained that *Collins* "simply discusses the need for a plea to be knowing and voluntary, which is the rationale underlying the requirement of Practice Book § 39-19 . . . . Therefore, *Collins* . . . does not stand for the proposition that the trial court must advise the defendant of *any consequence* to a plea that may increase the actual time he will spend in prison." (Emphasis added.) *State* v. *Andrews*, supra, 253 Conn. 508–509. This does not curtail the use of *Collins* in our analysis of the present case.

court to determine that the defendant understands the maximum possible sentence. Here, the respondents were not made aware of their maximum possible sentence even though it is a direct consequence of their decision to enter a nolo plea. See *State* v. *Andrews*, supra, 253 Conn. 507; *State* v. *Gilnite*, supra, 202 Conn. 383 n.17. Accordingly, they did not have all the relevant information required by our long-standing and well settled law. We therefore conclude that their pleas were not knowing and voluntary.

## II

The department nevertheless claims that the rehabilitative nature of the juvenile justice system permits extensions to delinquency commitments even if a court has not advised the juvenile of that possibility at the time of the plea. Although we agree with the department that one of the primary goals of the juvenile system is to do what is in the best interest of the child,[12] we

[12] General Statutes § 46b-121h provides: "It is the intent of the General Assembly that the juvenile justice system provide individualized supervision, care, accountability and treatment in a manner consistent with public safety to those juveniles who violate the law. The juvenile justice system shall also promote prevention efforts through the support of programs and services designed to meet the needs of juveniles charged with the commission of a delinquent act. The goals of the juvenile justice system shall be to:

"(1) Hold juveniles accountable for their unlawful behavior;

"(2) Provide secure and therapeutic confinement to those juveniles who present a danger to the community;

"(3) Adequately protect the community and juveniles;

"(4) Provide programs and services that are community-based and are provided in close proximity to the juvenile's community;

"(5) Retain and support juveniles within their homes whenever possible and appropriate;

"(6) Base probation treatment planning upon individual case management plans;

"(7) Include the juvenile's family in the case management plan;

"(8) Provide supervision and service coordination where appropriate and implement and monitor the case management plan in order to discourage reoffending;

"(9) Provide follow-up and nonresidential postrelease services to juveniles who are returned to their families or communities;

"(10) Promote the development and implementation of community-based

conclude that due process nevertheless requires a court to make such an advisement at the time of the plea.

The United States Supreme Court clearly has established that constitutional due process protections apply in the juvenile setting. *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). In *In re Gault*, supra, 27–28, the court explained that "[i]t is of no constitutional consequence—and of limited practical meaning—that the institution to which [a child] is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. . . . In view of this, it would be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase 'due process.' Under our Constitution, the condition of being a [child] does not justify a kangaroo court."

Thus, the question we must answer is not whether due process applies in the juvenile setting, but rather to what extent are those procedural safeguards applicable. Id., 13–14.[13] The underlying difficulty in this analysis arises because the state has a "parens patriae interest

programs designed to prevent unlawful behavior and to effectively minimize the depth and duration of the juvenile's involvement in the juvenile justice system."

Thus, it is clear that § 46b-121h includes both rehabilitation and accountability as desired goals of the juvenile justice system.

[13] In addressing similar issues, the United States Supreme Court has held that certain basic constitutional rights enjoyed by adults also apply to juveniles. See *Breed* v. *Jones*, 421 U.S. 519, 95 S. Ct. 1779, 44 L. Ed. 2d 346 (1975) (double jeopardy); *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (proof beyond reasonable doubt); *In re Gault*, supra, 387 U.S. 31–57 (notice of charges, right to counsel, privilege against self-incrimination, right to confrontation and cross-examination). The Supreme Court, however, also has refused to extend certain rights to the juvenile setting. See, e.g., *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971) (no right to jury trial).

in preserving and promoting the welfare of the child . . . ." *Santosky* v. *Kramer*, 455 U.S. 745, 766, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The state's role in juvenile proceedings presents a fundamental difference from adult criminal trials, where no such interest exists. *Schall* v. *Martin*, 467 U.S. 253, 263, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984).

This court's decision in *In re Steven G.*, 210 Conn. 435, 556 A.2d 131 (1989), demonstrates such a conflict. In that case, the juvenile respondent claimed that his rights to adequate and fair notice had been violated when the state was permitted, after the trial had commenced, to amend its petition, adding additional charges arising out of the same incident. Id., 436. In affirming the Appellate Court's decision to uphold the trial court's allowance of the amended petition, we underscored "the need to balance the state's essentially nonpunitive objectives in juvenile delinquency proceedings with the fundamental demands of due process." Id., 442.

This attempt to balance fundamental fairness with the unique characteristics of the juvenile justice system is also exemplified through the handling of juvenile matters in our rules of practice. Practice Book § 34-2 (a) provides that "[a]ll [juvenile] hearings are essentially civil proceedings except where otherwise provided by statute. Testimony may be given in narrative form and the proceedings shall at all times be as informal as the requirements of due process and fairness permit." Thus, we have tried "to strike a balance—to respect the informality and flexibility that characterize juvenile proceedings . . . and yet to ensure that such proceedings comport with the fundamental fairness demanded by the Due Process Clause." (Citation omitted; internal quotation marks omitted.) *Schall* v. *Martin*, supra, 467 U.S. 263.

In an attempt to strike such a balance between the unique characteristics associated with juvenile proceedings and the fundamental fairness required by due process, we compare these aspects in relation to our present facts. We begin by noting that in choosing to enter a guilty plea, an adult defendant necessarily waives several constitutional rights, including his privilege against self-incrimination and right to confrontation. See *Boykin* v. *Alabama*, supra, 395 U.S. 243; *McCarthy* v. *United States*, supra, 394 U.S. 466; *State* v. *Andrews*, supra, 253 Conn. 503. For this reason, we require that the defendant make that decision knowingly and intelligently in order to comport with due process. See *Boykin* v. *Alabama*, supra, 243; *McCarthy* v. *United States*, supra, 466; *State* v. *Andrews*, supra, 503. Additionally, the Supreme Court has held that certain rights are so fundamental to an accurate fact-finding process that they not only extend to adults, but also to juveniles. *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 543, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971). These rights include notice of charges, right to counsel, privilege against self-incrimination, right to confrontation and cross-examination; *In re Gault*, supra, 387 U.S. 31–57; proof beyond a reasonable doubt; *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); and the prohibition against double jeopardy. *Breed* v. *Jones*, 421 U.S. 519, 95 S. Ct. 1779, 44 L. Ed. 2d 346 (1975). Thus, when the respondents in the present case made their decisions to enter a nolo plea, they necessarily waived some of the same rights that require an adult defendant to make a knowing and voluntary plea. Moreover, we note that Practice Book § 31-1 (c) specifically requires that a juvenile's plea be knowing and voluntary.[14]

---

[14] Practice Book § 31-1 (c) provides: "Upon an admission or upon a written plea of nolo contendere, the judicial authority shall determine that there is a factual basis for the plea, and that the plea was voluntary and was knowingly entered, and shall thereafter on the petition convict the child as a delinquent or adjudicate that the family of the child is a family with service needs."

In that regard, it is important to understand that " 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' " *Jones* v. *United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), quoting *Addington* v. *Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). "A proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *In re Gault*, supra, 387 U.S. 36. "[C]ommitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' " Id., 50. The seriousness involved in the confinement of a juvenile compels us to conclude that the decision to enter a plea has no less of an implication on the rights of a juvenile than it does on the rights of an adult.

We weigh the importance of requiring a knowing and voluntary plea against the need to maintain "informality and flexibility" in the juvenile setting; *Schall* v. *Martin*, supra, 467 U.S. 263; and conclude that there will be little, if any, negative effect of such a requirement on the distinctiveness of the juvenile proceeding. Indeed, we see nothing to suggest that the requirement "risk[s] destruction of beneficial aspects of the juvenile process." *In re Winship*, supra, 397 U.S. 366.[15] The depart-

---

[15] In extending the right to be proven guilty beyond a reasonable doubt to juveniles, the Supreme Court in *In re Winship* explained that "[u]se of the reasonable-doubt standard during the adjudicatory hearing will not disturb New York's policies that a finding that a child has violated a criminal law does not constitute a criminal conviction, that such a finding does not deprive the child of his civil rights, and that juvenile proceedings are confidential. Nor will there be any effect on the informality, flexibility, or speed of the hearing at which the factfinding takes place. And the opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment will remain unimpaired. Similarly, there will be no effect on the procedures distinctive to juvenile proceedings that are employed prior to the adjudicatory hearing." *In re Winship*, supra, 397 U.S. 366–67.

ment, however, claims that the United States Supreme Court's decision in *McKeiver* v. *Pennsylvania,* supra, 403 U.S. 528, undermines any argument for the extension of the advisement to juvenile proceedings. We conclude that the department's reliance on that case is misguided. In *McKeiver,* the court refused to extend the right to a trial by jury to juvenile proceedings. In concluding that our legal system does not require a jury for accurate fact-finding, the court cited equity, workers' compensation, probate, and deportation cases as examples wherein a jury is not required. Id., 543. The court also determined that "[t]here is a possibility, at least, that the jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." Id., 545. We have no reason to believe that the unique setting presented by a juvenile proceeding similarly will be damaged by requiring that a juvenile be advised of the possibility of commitment extension before a plea is accepted.

Because of the seriousness involved in the institutionalization of a juvenile, and the lack of a negative effect on juvenile proceedings, we conclude that a juvenile is entitled to be advised of the possibility of commitment extensions when making a plea. The status of being a juvenile does not warrant abandonment of the well established rule that a defendant be advised of the direct consequences of his plea.

The judgment is affirmed.

In this opinion the other justices concurred.