******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE ANGEL R.*
(AC 36692)

Lavine, Alvord and Bishop, Js.

*Argued November 20, 2014—officially released June 16, 2015*

(Appeal from Superior Court, judicial district of Fairfield, Juvenile Matters at Bridgeport, B. Kaplan, J.)

*James Jude Connolly*, director of juvenile post conviction, with whom were *Lindsey Guerrero*, assistant public defender, and, on the brief, *Joshua Michtom*, assistant public defender, and *Aaron J. Romano*, for the appellant (respondent).

*Michael Besso*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner Commissioner of Children and Families).

*Sandra J. Staub* and *David McGuire* filed a brief for the American Civil Liberties Union of CT as amicus curiae.

*Opinion*

BISHOP, J. The respondent, Angel R., appeals from the judgment of the trial court granting the motion filed by the petitioner, the commissioner of the Department of Children and Families (DCF), to transfer her from DCF's custody to the custody of the Department of Correction (DOC). On appeal, the respondent claims that General Statutes § 17a-12 (a) violates the federal and Connecticut constitutions on the ground that its application to the respondent deprives her of due process in the following ways: (1) the statute is impermissibly vague; and (2) the statute permits the court to order her transferred from the care of DCF to DOC without affording to her the procedural rights to which she is entitled, specifically, the right to a trial by jury, and the obligation that DCF prove its allegations by proof beyond a reasonable doubt. She claims, as well, that the court incorrectly denied her motion to dismiss DCF's transfer petition because her guilty plea in a prior delinquency proceeding to having violated General Statutes § 53a-167c was not knowing and voluntary.[1] We agree, in part, with the respondent's due process claim regarding the state's burden of proof at a transfer hearing, and, accordingly, reverse the judgment of the trial court.

The court's memorandum of decision reveals the following undisputed facts and procedural history that are relevant to our disposition of the respondent's appeal. The respondent is a seventeen year old transgender female.[2] She has been involved with DCF on and off since the age of five. Throughout her lengthy history with DCF, she has exhibited assaultive behavior toward staff members, other juveniles, and females. On November 21, 2013, the respondent was adjudicated as delinquent on the basis of her guilty plea to assault on an officer.[3] She was thereafter committed to DCF pursuant to General Statutes § 46b-140 for a period not to exceed eighteen months. On the basis of this delinquency commitment, the respondent was placed at the Meadowridge Academy in Swansea, Massachusetts (Meadowridge). During her two month placement at Meadowridge, the respondent evinced assaultive behaviors. On January 31, 2014, as a result of her assault on a staff person, the respondent was removed from Meadowridge and placed at the Connecticut Juvenile Training School.

On February 4, 2014, pursuant to § 17a-12 (a), DCF filed a motion to transfer the respondent to the John R. Manson Youth Institution (Manson), a high security institution run by DOC for young male offenders ranging in age from fourteen to twenty-one years old, usually with pending adult charges or serving adult sentences as a consequence of having been tried in the Superior Court as adults. On February 24, 2014, the respondent filed a motion to dismiss DCF's motion to transfer. After holding a series of evidentiary hearings and making

findings of fact by a preponderance of the evidence, the court, on March 20, 2014, denied the respondent's motion to dismiss and followed with an articulation of its reasoning on April 8, 2014. Also, on April 8, 2014, the court granted DCF's motion to transfer the respondent and ordered that the respondent be transferred to the York Correctional Institution in Niantic (Niantic), a correctional institution for females of all levels of security operated by DOC.[4] On May 6, 2014, the court filed a memorandum of decision in support of its April 8 order to transfer. This appeal followed.[5] Additional facts will be set forth as necessary.

The statute at issue, § 17a-12 (a), provides: "When the commissioner, or the commissioner's designee, determines that a change of program is in the best interest of any child or youth committed or transferred to the department, the commissioner or the commissioner's designee, may transfer such person to any appropriate resource or program administered by or available to the department, to any other state department or agency, or to any private agency or organization within or without the state under contract with the department; provided no child or youth voluntarily admitted to the department under section 17a-11 shall be placed or subsequently transferred to the Connecticut Juvenile Training School; and further provided no transfer shall be made to any institution, hospital or facility under the jurisdiction of the Department of Correction, except as authorized by section 18-87, unless it is so ordered by the Superior Court after a hearing. When, in the opinion of the commissioner, or the commissioner's designee, a person fourteen years of age or older is dangerous to himself or herself or others or cannot be safely held at the Connecticut Juvenile Training School, if a male, or at any other facility within the state available to the Commissioner of Children and Families, the commissioner, or the commissioner's designee, may request an immediate hearing before the Superior Court on the docket for juvenile matters where such person was originally committed to determine whether such person shall be transferred to the John R. Manson Youth Institution, Cheshire, if a male, or the Connecticut Correctional Institution, Niantic, if a female. The court shall, within three days of the hearing, make such determination. If the court orders such transfer, the transfer shall be reviewed by the court every six months thereafter to determine whether it should be continued or terminated, unless the commissioner has already exercised the powers granted to the commissioner under section 17a-13 by removing such person from the John R. Manson Youth Institution, Cheshire or the Connecticut Correctional Institution, Niantic. Such transfer shall terminate upon the expiration of the commitment in such juvenile matter."[6]

The respondent raises three claims on appeal with respect to the granting of DCF's motion to transfer. The

first two issues implicate the respondent's due process rights under the United States and Connecticut constitutions. The due process claims relate to whether the statute in question is impermissibly vague and to whether the transfer hearing afforded to the respondent pursuant to the statute adequately protected her liberty interests. The third issue relates to whether the respondent's plea that resulted in a delinquency finding was knowing and voluntary. We take up each in turn.

I

As a preliminary matter, however, we must consider whether the issues raised on appeal are moot because, since the filing of this appeal, the respondent has been returned to the custody of DCF and also because she will attain the age of eighteen during this calendar year.

It is well established that "[m]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve." (Internal quotation marks omitted.) *In re Emma F.*, 315 Conn. 414, 423, 107 A.3d 947 (2015). "Because mootness implicates this court's subject matter jurisdiction, it may be raised at any time, including by this court sua sponte." *State* v. *Charlotte Hungerford Hospital*, 308 Conn. 140, 143, 60 A.3d 946 (2013). Accordingly, before reaching the merits of this appeal, we must address the threshold issue of whether the respondent's claims are moot and, if so, whether we have jurisdiction over the matter on the basis of an exception to the mootness doctrine.

"Mootness is a threshold issue that implicates subject matter jurisdiction, which imposes a duty on the court to dismiss a case if the court can no longer grant practical relief to the parties." (Internal quotation marks omitted.) *New Image Contractors*, *LLC* v. *Village at Mariner's Point Ltd. Partnership*, 86 Conn. App. 692, 698, 862 A.2d 832 (2004). "When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) *In re Steven M.*, 264 Conn. 747, 754, 826 A.2d 156 (2003).

As noted, the respondent was returned to the custody of DCF on June 24, 2014; see footnote 5 of this opinion; additionally, the file reflects that she will reach the age of majority prior to the end of 2015. In its brief, while asserting that the matter is moot because the respondent has been returned to its custody, DCF also concedes that the matter may be reviewable under the "capable of repetition, yet evading review" exception

to the mootness doctrine.[7] "To qualify under this exception, an otherwise moot question must satisfy the following three requirements: First, the challenged action, or the effect of the challenged action, by its very nature, must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." (Internal quotation marks omitted.) *We the People of Connecticut, Inc.* v. *Malloy*, 150 Conn. App. 576, 583, 92 A.3d 961, cert. denied, 314 Conn. 919, 100 A.3d 850 (2014).

In the case of *In re Steven M.*, supra, 264 Conn. 747, which concerned § 17a-12 (a), our Supreme Court confronted the mootness issue we now face. Id., 750. As an initial matter, the court in *In re Steven M.* held that the juvenile's challenge under the statute was moot because, during the pendency of the appeal, the juvenile had reached the age of eighteen and was no longer in the custody of DCF. Id., 754. Next, the court analyzed whether the challenge qualified for review under the "capable of repetition, yet evading review" exception to mootness. Id., 754–55. In particular, the court noted that "[p]ursuant to General Statutes § 46b-141 (a), a juvenile who has been convicted as a delinquent shall be committed to the custody of the department [of children and families] for (1) an indeterminate time up to a maximum of eighteen months . . . . At any time after commencement of that eighteen month time period, the department may seek to have the juvenile transferred pursuant to § 17a-12 (a)." (Footnote omitted; internal quotation marks omitted.) Id., 755. On the basis of the interplay between these two statutes, the court held that "[t]he effect of the transfer order is thus limited, by its very nature, to less than eighteen months and, therefore, is of such a limited duration that a substantial majority of the cases in which such an order is entered will evade review." Id., 755–56. Furthermore, the court held that there was a reasonable likelihood that the questions presented by the case would arise each time that DCF seeks to transfer a delinquent juvenile to the custody of DOC and that recurrence of this issue would affect a reasonably identifiable group for whom the juvenile could be said to act as surrogate. Id., 756. Finally, the court concluded that the issue presented a question of public importance. Id. On the basis of the foregoing, the court held that the issues presented in the juvenile's challenge to § 17a-12 (a) were "capable of repetition, yet evading review." (Inter-

nal quotation marks omitted.) Id.

Our Supreme Court's mootness analysis from *In re Steven M.* is equally applicable to the case at hand. Here, the respondent was committed as delinquent pursuant to § 46b-140 and is therefore subject to transfer under § 17a-12 (a). Pursuant to § 46b-141, a juvenile who has been convicted as a delinquent shall be in the custody of DCF only for "an indeterminate time up to a maximum of eighteen months . . . ." Therefore, DCF's ability to transfer a delinquent juvenile from its own custody to the custody of DOC pursuant to § 17a-12 (a) is limited to the eighteen month period when the juvenile is in the custody of DCF. Furthermore, there is a reasonable likelihood that the issues presented in this appeal will arise each time that DCF seeks to transfer a delinquent juvenile to the custody of DOC and these issues will affect a reasonably identifiable group for whom the respondent can be said to act as a surrogate. Finally, we conclude that the claims raised in this appeal present a question of public importance, specifically, whether a statute that permits the transfer of a minor in the custody of DCF to be transferred to DOC to be housed at Manson, if a male, or Niantic, if female, is constitutional. Indeed, whether a delinquent child committed to the state's protective supervision under DCF can legally be imprisoned in an adult penal institution under the supervision of DOC raises questions fundamental to a fair society. On the basis of the foregoing, we conclude that the questions presented by this appeal are "capable of repetition, yet evading review." Accordingly, we address each of the claims raised on appeal.

## II

At the outset, we set forth certain precepts that guide our constitutional analysis. "The constitutionality of a statute presents a question of law over which our review is plenary. . . . It is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Citation omitted; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012).

Additionally, "this court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities . . . ." (Internal quotation marks omitted.) *State*

v. *Cook*, 287 Conn. 237, 245, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "Further, in evaluating [a] defendant's challenge to the constitutionality of [a] statute, we read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it. We will indulge in every presumption in favor of the statute's constitutionality . . . . In so doing, we take into account any prior interpretations that this court, our Appellate Court and the Appellate Session of the Superior Court have placed on the statute. . . . Finally, we may also add interpretive gloss to a challenged statute in order to render it constitutional. In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Indrisano*, 228 Conn. 795, 805–806, 640 A.2d 986 (1994).

A

The respondent claims that § 17a-12 (a) is unconstitutional under the fourteenth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution because it is void for vagueness. She argues that § 17a-12 (a) does not provide fair notice of what conduct is prohibited, nor does it establish minimum guidelines to govern law enforcement. In particular, the respondent argues that because the determination of whether to transfer an individual from a secure juvenile setting to an adult prison requires consideration of whether the individual is "dangerous" to himself, herself or others, the definition of the term "dangerous" must be explicated in the statute so that a person potentially subject to the statute has reasonable notice of what behavior may or may not be considered to be dangerous. For example, as the respondent points out, the notion of dangerousness could contemplate behavior that poses no risk of physical danger but could present a circumstance of moral danger. The statute, however, does not address whether the term "dangerous" is intended to relate only to physical danger or is intended to encompass other forms of danger as well.[8] In response, DCF argues that § 17a-12 (a) is not void for vagueness because the respondent's conduct clearly comes within the statute's core of prohibited conduct. Specifically, DCF argues that the respondent was on notice that she could be subject to transfer to DOC pursuant to § 17a-12 (a) because her assaultive behaviors have presented dangers, and, indeed, injuries to others.

The determination of whether a statute is unconstitutionally vague presents a question of law over which our review is de novo. *State* v. *Knybel*, 281 Conn. 707, 713, 916 A.2d 816 (2007). "[A] penal statute [must] define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohib-

ited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [This concept] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . [T]he [most] important aspect of the vagueness doctrine is not actual notice . . . but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained [the] statute will not be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the [respondent's] actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . . [T]o prevail on [her] claim, the [respondent] must demonstrate . . . that the statute, as applied to [her], deprived [her] of adequate notice of what conduct the statute proscribed or that [she] fell victim to arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) *State* v. *Stephens*, 301 Conn. 791, 801–802, 22 A.3d 1262 (2011).

"The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. The Connecticut constitution also requires that statutes with penal consequences provide sufficient notice to citizens to apprise them of what conduct is prohibited." (Internal quotation marks omitted.) *State* v. *Stuart*, 113 Conn. App. 541, 560–61, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009). "In undertaking such review, we make every presumption in favor of the statute's validity. . . . Accordingly, [t]o demonstrate that [a statute] is unconstitutionally vague as applied to [the respondent, she must] . . . demonstrate . . . that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary and discriminatory enforcement." (Citation omitted; internal quotation marks omitted.) *State* v. *LaFontaine*, 128 Conn. App. 546, 550–51, 16 A.3d 1281 (2011).

As noted, the statute in question, § 17a-12 (a), subjects a juvenile in the custody of DCF to being transferred from the custody of DCF to an adult correctional facility "[w]hen, in the opinion of the commissioner, or the commissioner's designee, a person fourteen years of age or older is *dangerous to himself or herself or others or cannot be safely held* at the Connecticut Juvenile Training School, if a male, or at any other facility within the state available to the Commissioner of Children and Families . . . ."[9] (Emphasis added.)

The crux of the respondent's vagueness argument is that § 17a-12 (a) does not provide fair notice of what conduct is prohibited. Specifically, she argues that the term "dangerous" must be clearly defined in the body of the statute because, as it is currently written, it does not provide notice to individuals regarding what behaviors can result in transfer to an adult correctional facility.

The facts here, which do not involve first amendment issues, defeat the respondent's claim that the statute is void for vagueness as applied to her. Contrary to her claim of inadequate notice of proscribed behavior, the record amply supports the conclusion that the respondent exhibited physically dangerous behaviors while in the custody of DCF and was, in fact, adjudicated delinquent on the basis of a physical assault. In light of this history, the respondent's claim that she was not on notice that her behaviors could reasonably be seen as dangerous to herself or others must fail. We conclude that a person of ordinary intelligence in the respondent's circumstances would comprehend that the assaultive behavior she exhibited could be found to present a danger to others. In sum, we are persuaded that a person of ordinary intelligence would understand, from a fair reading of the statute, that physically assaultive behaviors such as exhibited by the respondent would subject a DCF ward to the transfer provisions set forth in § 17a-12 (a). The statute is not void for vagueness as applied to the respondent.

B

The respondent next claims that § 17a-12 (a) is unconstitutional under the fifth, sixth, and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, and § 19, of the Connecticut constitution, as amended by article four of the amendments, because it allows for the imprisonment of an individual without procedural due process. Specifically, the respondent argues that a transfer from DCF to DOC infringes on a constitutionally protected liberty interest and that due process requires that before a delinquent juvenile can be deprived of this liberty interest, he or she must be given certain procedural protections lacking in the subject statute such as the right to a jury trial and an adjudication that is based on proof beyond a reasonable

doubt, adduced by DCF, that a person's transfer from DCF to DOC comports with the statute's criteria for transfer. In response, DCF claims that, absent facts that a transfer under § 17a-12 (a) amounts to a penal imprisonment and attendant major changes in the conditions of confinement, the due process rights of a juvenile who has already been adjudicated as delinquent are adequately protected by the manner in which the transfer statute was applied to the respondent. Specifically, DCF argues that due process considerations do not require that a juvenile subject to the provisions of § 17a-12 (a) be afforded the right to a trial by jury, and a standard that requires proof by a preponderance of evidence is appropriate to a person in the respondent's status. In sum, DCF claims that because the respondent is already in the custody of the state, the risk to her of a transfer from one place of confinement to another does not warrant an elevated character of due process.

"The requirements for a successful due process claim are well established. The fourteenth amendment to the United States constitution provides that the State [shall not] deprive any person of life, liberty, or property, without due process of law . . . . In order to prevail on [her] due process claim, the [respondent] must prove that: (1) [she] has been deprived of a property [or liberty] interest cognizable under the due process clause; and (2) the deprivation of the property [or liberty] interest has occurred without due process of law." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Angel C.*, 245 Conn. 93, 104, 715 A.2d 652 (1998). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." (Internal quotation marks omitted.) Id. The United States Supreme Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek* v. *Jones*, 445 U.S. 480, 488, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980). As a general matter, "[w]here procedural due process must be afforded because a liberty or property interest is within the Fourteenth Amendment's protection, there must be determined what process is due in the particular context." (Internal quotation marks omitted.) *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 847, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977).

Finally, in this regard, we note that a due process analysis cannot be conducted in a vacuum. Our Supreme Court has repeatedly "stated that, [a] procedural due process challenge to the validity of [a statute] cannot proceed in the abstract. . . . It is a settled rule of constitutional adjudication that a court will decide the constitutionality of a statute only as it applies to the particular facts at hand. . . . A party who challenges the constitutionality of a statute must prove that the statute has adversely affected a protected interest

under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist. . . . Therefore, [a] claim that a statute fails, on its face, to comport with the constitutional requirements of procedural due process reflects a fundamental misunderstanding of the law of due process. Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands. . . . The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 522–23, 847 A.2d 862 (en banc), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). As noted by the United States Supreme Court: "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." (Citation omitted; internal quotation marks omitted.) *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); see also *Jones* v. *Connecticut Medical Examining Board*, 309 Conn. 727, 736, 72 A.3d 1034 (2013).

In assessing the level of due process required in any particular judicial setting, the Supreme Court, in *Mathews*, set forth three factors to be considered in balancing the respective interests of the parties: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge*, supra, 424 U.S. 335.

We turn now to an application of these principles to the procedural facts at hand. As a juvenile committed to DCF, the respondent is entitled to some level of due process in a hearing that could subject her to incarceration in an adult correctional facility. The question presented to us entails an assessment of the character and scope of such due process. To be sure, although juvenile court hearings need not conform to all requirements of adult criminal proceedings, juvenile proceedings "must measure up to the essentials of due process and fair treatment." *Kent* v. *United States*, 383 U.S. 541, 562, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). Put another way and as observed by the United States Supreme Court: "[T]he applicable due process standard in juvenile proceedings . . . is fundamental fairness." *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 543, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971).

But, while a juvenile is entitled to due process, the specific contours of that right, in the setting of juvenile proceedings, need not mirror adult proceedings. "Unlike an adult's liberty interest, however, a juvenile's liberty interest always is limited by the state's independent parens patriae interest in preserving and promoting the juvenile's welfare, and must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody. . . . Thus, due process does not mandate elimination of all differences in the treatment of juveniles. . . . Moreover, just as a criminal conviction sufficiently extinguished the [adult] defendant's liberty interest to empower the State to confine him in any of its prisons . . . *unless the transfer to a different facility constitutes a major change in the conditions of confinement amounting to a grievous loss . . . a juvenile who already has been adjudicated delinquent and is in the custody of the state does not possess the same liberty interest as a juvenile who faces delinquency proceedings.* A fortiori, a delinquent juvenile who faces transfer proceedings pursuant to § 17a-12 (a) does not have the same liberty interest as an adult who faces criminal proceedings." (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Steven M.*, supra, 264 Conn. 763.

As a threshold matter, we address DCF's assertion that our Supreme Court, in *In re Steven M.*, supra, 264 Conn. 747, resolved all the due process issues presently raised by the respondent in the appeal at hand. DCF urges this court to rely on *In re Steven M. a*s the sole appellate authority on § 17a-12 (a), arguing that *In re Steven M.* correctly analyzed United States Supreme Court precedent and other decisions to determine that a juvenile does not have the same level of liberty interest during a transfer proceeding that she or he might have if facing criminal or delinquency charges. DCF is correct in that, pursuant to *In re Steven M.*, the respondent, when facing a transfer hearing under the subject statute, does not have the same liberty interest as a criminal defendant in adult proceedings or a juvenile facing delinquency proceedings. Our Supreme Court, in *In re Steven M.*, said as much. See id., 763. That determination, however, does not settle the question of the particular quality of due process to which a juvenile is entitled when confronted by a transfer application under § 17a-12 (a). In *In re Steven M.*, the court was not confronted with the qualitative claims we face in the present appeal requiring this court, on review, to elucidate the quality and contours of due process necessary to a constitutionally adequate transfer hearing. In *In re Steven M.*, the respondent claimed that the court, in a statutory transfer hearing, was required to find that such a transfer was in the respondent's best interest. Id., 756. Rejecting this claim, the court held that the trial court, in such a hearing, need only *consider* the child's best interest and that a transfer could be made properly, even absent a

finding that it was in a child's best interest, if the court finds that the child is dangerous to himself, herself, or others or that DCF cannot safely maintain the child in its custody. Id., 756–57. The court in *In re Steven M.* held, as well, that the trial court, when conducting a transfer hearing, should determine the child's competency and, if the child is not competent, should appoint a guardian ad litem for the child. Id., 764. Neither of those issues is presented in the present appeal. In sum, the specific procedural due process claims made in this appeal were not presented in *In re Steven M.*

We consider next the respondent's claim that she is entitled to a trial by jury. She makes this claim on the basis of her assertion that because, as a result of a transfer hearing, she could be transferred to DOC where she could be held in custody in an adult correctional facility in which all the other inmates were afforded the right to trial by jury, she should not be treated differently merely because of her juvenile status.

In *McKeiver* v. *Pennsylvania*, supra, 403 U.S. 528, the United States Supreme Court was confronted with a claim by a juvenile that because due process applies to juvenile delinquency proceedings, a juvenile should not be adjudicated delinquent without the benefit of a jury trial. Recognizing that post-*Gault*[10] juveniles were entitled to certain due process rights, the court in *McKeiver* nevertheless declined to find that fundamental fairness dictated the right to a jury trial in juvenile proceedings, stating: "[W]e conclude that trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." Id., 545. Although this claim presents a difficult question because the result of a transfer order is that a juvenile is committed to a penal institution where only convicted inmates or those awaiting trial are housed, we believe that the court's reasoning in *McKeiver* is applicable to a transfer hearing as well.[11] There, the court expressed its concern that a trial by jury could make the juvenile process fully adversary, that the imposition of a jury requirement would not necessarily strengthen fact finding, and that requiring a jury would invariably introduce delays often against the best interest of the child in question. Id., 545–50. Although the court in *McKeiver* was considering the due process need for a jury trial in a delinquency hearing, we believe its reasoning is equally applicable to a transfer hearing under § 17a-12, even though the result of such a hearing could be the transfer of a child's custody to DOC.

We come to this conclusion, in part, on the basis of the protections embedded in § 17a-12 (a) and by the nature of the determinations that must be made in order to properly act pursuant to the statute. Even though the court, in this instance, granted DCF's motion to transfer the respondent to DOC, the court's transfer order was specific as to which correctional facility the

respondent would be transferred. It ordered: "The Motion to Transfer Angel to the Commissioner of Correction is GRANTED. She is ordered transferred to Niantic as a transgendered female." Additionally, the statute contemplates that DCF has a continuing role in monitoring the juvenile's well-being while in DOC's custody. The statute requires, as well, that if the court orders a transfer, the court must conduct a review every six months to determine whether the juvenile's commitment to DOC should continue or be terminated unless the juvenile has already been returned to DCF's custody.

In addition to these statutory safeguards, there is the practical consideration that the fact-finding prerequisites to the statute's application are better suited for the determination of a judge than by lay members of a jury. In order to make a transfer decision, a fact finder must consider whether such a transfer is in a child's best interest, whether a child is dangerous to himself, herself or others, whether DCF cannot safely retain the child's custody, and whether DOC offers a suitable environment for such a juvenile. Lay people, however, would not be required to have any knowledge of the workings of DCF or DOC or the juvenile justice system in order to be qualified as jurors. In balance, we believe that a child's best interests and the community's concerns are adequately protected by a hearing conducted hearing before a judge without the need for a jury.

The respondent next claims that in pursuing a motion to transfer, due process requires that the proponent of the motion should bear the burden of proving its allegations by proof beyond a reasonable doubt. In response, DCF argues that a determination based on a preponderance of the evidence adequately protects a juvenile's due process rights. We agree with the respondent's assertion that a preponderance standard of proof does not adequately protect the juvenile's liberty interest at stake in a transfer hearing. We do not agree, however, that due process considerations mandate that DCF should be required to prove its allegations beyond a reasonable doubt.

At the outset, we comment briefly on the character of evidence that must be adduced at a transfer hearing pursuant to § 17a-12 (a) in order for the statute to pass constitutional scrutiny. As pointed out by our Supreme Court in *In re Steven M.*, supra, 264 Conn. 756, the proponent of the transfer must introduce some evidence that a transfer is in the juvenile's best interest. Although our Supreme Court indicated in *In re Steven M.* that the trial court need not find that a transfer is, in fact, in a juvenile's best interest, it is a factor the court should consider. Id. This factor requires evidence that the anticipated conditions of incarceration under the supervision of DOC are necessitated by the level of the juvenile's dangerousness and that the protections

and care afforded a juvenile under DCF supervision are not extinguished by the transfer of a juvenile to an adult penal facility. Additionally, the proponent must adduce evidence that the juvenile is a danger to himself, herself, or to others or cannot be safely held in DCF custody. Id., 756–57. Our conclusion is rooted in due process considerations and based on the practicality that DCF, as the moving party to a transfer request pursuant to § 17a-12 (a), is in a far superior position to adduce evidence relevant to the statute's application than a juvenile defending against such a transfer and a person, presumably, with no independent knowledge of the circumstances that he or she may be facing if incarcerated in a correctional facility.

We turn next to the question of the level of burden of proof. In the case at hand, after hearing evidence over the course of six days, the court found, on the basis of a preponderance of the evidence, that the respondent was too dangerous to be housed at a facility operated by DCF and, accordingly, ordered her transferred to the custody of DOC.

Contrary to DCF's claims, we conclude that the respondent has a liberty interest in not being transferred from the protective umbrella of DCF to the penal environment of a DOC institution such as Manson or Niantic. We are, of course, mindful of our Supreme Court's dicta in *In re Steven M.*: "Unlike an adult's liberty interest . . . a juvenile's liberty interest always is limited by the state's independent parens patriae interest in preserving and promoting the juvenile's welfare, and must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." (Internal quotation marks omitted.) Id., 763. In stating that a juvenile who has already been adjudicated a delinquent does not have the same liberty interest as an adult, the court in *In re Steven M.* did not conclude or even suggest that a juvenile is devoid of any liberty interest in not being confined in an adult correctional facility. To the contrary, our Supreme Court's discussion in *In re Steven M.* must be read as being in harmony with the court's salutary comments recently made in *In re Jusstice W.*, 308 Conn. 652, 65 A.3d 487 (2012). There, the court opined: "Connecticut's juvenile justice system is designed to provide delinquent minors with guidance and rehabilitation . . . . The objective of juvenile court proceedings is to determin[e] the needs of the child and of society rather than adjudicat[e] criminal conduct. The objectives are to provide measures of guidance and rehabilitation . . . not to fix criminal responsibility, guilt and punishment. . . . Thus the child found delinquent is not perceived as a criminal guilty of one or more offenses, but rather as a child in need of guidance and rehabilitative services." (Citations omitted; internal quotation marks omitted.) Id., 666. In light of the language of *In re Jusstice W.* regarding the purpose of the juvenile justice system, we cannot

conclude that a juvenile subject to transfer from the protections of DCF to be confined in a penal institution under DOC supervision is shorn of due process rights. Thus, we do not read *In re Steven M.* beyond its holding to adopt a minimalist view of a juvenile delinquent's rights to due process when subject to transfer under § 17a-12 (a). And, as we have noted, the court in *In re Steven M.* was not confronted with the specific due process claims made in the case at hand.

We proceed with the acknowledgement that a juvenile, like an adult, is constitutionally entitled to proof beyond a reasonable doubt when charged with a violation of criminal law and, thereby, subject to a delinquency determination. See *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); see also *In re Jason C.*, 255 Conn. 565, 767 A.2d 710 (2001).

The respondent, however, is not in the same legal position as a juvenile, not yet committed to the state, who is facing a delinquency charge. There, a juvenile faces a risk of confinement, a significant loss of liberty. Here, to the contrary, the respondent had already sustained a loss of liberty by reason of the previous delinquency adjudication and attendant commitment. Thus, the respondent's liberty interest is attenuated from that of a child who has not yet suffered a loss of liberty.

Nevertheless, such a child retains a liberty interest in not being transferred to an institution that operates under none of the child protective mandates embedded in legislation regarding the operations of DCF.

A comparison of the disparate missions of the two agencies is instructive. As indicated in General Statutes § 46b-121h, the intention of the juvenile justice system is to "provide individualized supervision, care, accountability and treatment in a manner consistent with public safety to those juveniles who violate the law. The juvenile justice system shall also promote prevention efforts through the support of programs and services designed to meet the needs of juveniles charged with the commission of a delinquent act. . . ." Furthermore, the goals of the juvenile justice system, inter alia, are to: "(1) Hold juveniles accountable for their unlawful behavior; (2) Provide secure and therapeutic confinement to those juveniles who present a danger to the community; (3) Adequately protect the community and juveniles; (4) Provide programs and services that are community-based and are provided in close proximity to the juvenile's community; (5) Retain and support juveniles within their homes whenever possible and appropriate; (6) Base probation treatment planning upon individual case management plans; (7) Include the juvenile's family in the case management plan . . . ." General Statutes § 46b-121h.

In contrast, DOC's mission statement reads: "The [DOC] shall strive to be a global leader in progressive

correctional practices and partnered re-entry initiatives to support responsive evidence-based practices aligned to law-abiding and accountable behaviors. Safety and security shall be a priority component of this responsibility as it pertains to staff, victims, citizens and offenders." State of Connecticut Department of Correction, "Mission Statement and Vision," (last modified April 4, 2014), available at http://www.ct.gov/doc/lib/doc/pdf/ad/ad0101.pdf (last visited June 5, 2015) (copy contained in the file of this case in the Appellate Court clerk's office). Notably absent from DOC's mission are the child-protective and programmatic features of DCF's obligation to juveniles in its care. Given the disparate missions of DOC and DCF and, in particular, the absence of any child-centric responsibilities in DOC's charter, we believe a juvenile has a heightened liberty interest at stake in a transfer hearing under § 17a-12 (a) in which the proponent of such a transfer must, constitutionally, be required to adduce proof adequate to justify invoking the statute's provisions at a standard greater than a mere preponderance.

"In cases involving individual rights, whether criminal or civil, [t]he standard of proof [at a minimum] reflects the value society places on individual liberty." (Internal quotation marks omitted.) *Addington* v. *Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). "It is well established that, [w]here no standard of proof is provided in a statute, due process requires that the court apply a standard which is appropriate to the issues involved. . . . [I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants. . . .

"Thus, while private parties may be interested intensely in a civil dispute over money damages, application of a fair preponderance of the evidence standard indicates both society's minimal concern with the outcome, and a conclusion that the litigants should share the risk of error in roughly equal fashion. . . . When the [s]tate brings a criminal action to deny a defendant liberty or life, however, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. . . . The stringency of the beyond a reasonable doubt standard bespeaks the weight and gravity of the private interest affected . . . society's interest in avoiding erroneous convictions, and a judgment that those interests together require that society impos[e] almost the entire risk of error upon itself. . . .

"[The United States Supreme] Court has mandated an intermediate standard of proof—clear and convincing

evidence—when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money. . . . Notwithstanding the state's civil labels and good intentions . . . this level of certainty [is] necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma. . . .

"In [*Santosky* v. *Kramer*, 455 U.S. 745, 769–70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)], the United States Supreme Court held that, in a hearing on a petition to terminate parental rights, due process require[s] that the state prove statutory termination criteria by a clear and convincing evidence standard rather than by a fair preponderance of the evidence standard." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 69–71, 939 A.2d 1040 (2008).

In determining the appropriate standard of proof, and recognizing that a juvenile who has already been adjudicated as a delinquent does not have the same liberty interest as an adult criminal defendant or a juvenile who has not already been adjudicated, we are persuaded that the liberty interest at stake in being transferred from the custody of DCF to DOC is sufficiently great to warrant the requirement that, before ordering such a transfer, the court must be convinced by evidence greater than a mere preponderance that the requisites for transfer have been proven.

In granting a transfer motion under § 17a-12 (a), the court gives its imprimatur to transferring a juvenile from a facility operated by DCF under its care and treatment mandate to a penal institution whose primary purpose is to incarcerate criminal offenders in a secure environment and whose purpose does not relate to the state's parens patriae responsibility to minors. We conclude, accordingly, that in order to protect the constitutionality of the transfer statute, the burden should be on DCF to adduce evidence regarding whether a transfer to DOC is warranted by "clear and convincing evidence," that the juvenile subject to transfer to DOC is a danger to himself or herself or others or cannot be safely held under the supervision of DCF. Some evidence must also be adduced by the proponent that a transfer is in the juvenile's best interest.[12] In *In re Steven M.*, supra, 264 Conn. 763, our Supreme Court observed that "unless the transfer to a different facility constitutes a major change in the conditions of confinement amounting to a grievous loss . . . a juvenile who already has been adjudicated delinquent and is in the custody of the state does not possess the same liberty interest as a juvenile who faces delinquency proceedings." (Citation omitted; internal quotation marks omitted.) The "grievous loss" language employed in *In re Steven M.* stems from a United States Supreme Court opinion in *Vitek* v. *Jones*,

supra, 445 U.S. 480. There, the court found that when a person loses his liberty as a result of a criminal conviction, the state is thus empowered to confine him in any of its prisons, but the convicted criminal nevertheless has a liberty interest in not being transferred to a mental health facility. Id., 493. The court reasoned: "[C]hanges in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause [a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him." (Internal quotation marks omitted.) Id. In the case at hand, the respondent is not confronted with a change in the conditions of her custody while a ward of DCF; instead, the statute in question contemplates her transfer to a separate agency, one with a fundamentally different societal purpose.

Requiring this quantum and character of proof provides a framework that assures that implementation of the statute's transfer provision is not tantamount to an abdication of DCF's parens patriae responsibility to juveniles in its care.

In the case at hand, DCF was not held to a clear and convincing standard regarding the respondent's level of dangerousness or its inability to safely maintain the respondent in its care. As a consequence, the respondent was denied due process in the transfer process. Accordingly, the judgment of the court regarding transfer cannot stand.

III

The respondent's final claim is that the court erred in finding that her plea, entered on November 13, 2013, was knowing and voluntary. In particular, the respondent argues that for her plea to be knowing and voluntary, she should have been informed that DCF had the ability to request her transfer from its custody to the custody of DOC because such a transfer constitutes a direct consequence of the plea. In response, DCF argues that the respondent's placement under the supervision of DOC after her adjudication of delinquency is an indirect, collateral consequence and, therefore, the failure to inform the respondent of her potential transfer to the custody of DOC does not render her plea unknowing or involuntary. We agree with DCF.

The following additional facts are relevant to our resolution of the respondent's claim. On November 13, 2013, the respondent entered a plea of guilty to the charge of having violated § 53a-167c. At the time of the respondent's plea, the court canvassed the respondent. The court asked, inter alia, for the respondent's date of birth, whether she was under the influence of any substances, and whether she had an opportunity to discuss her plea with her counsel. The court asked the respondent whether she was satisfied with the advice

and assistance given to her by her counsel and whether she understood the possible consequences of her plea. Specifically, the court asked: "Do you understand that if you're adjudicated a delinquent, you can be committed to DCF for a period not to exceed forty-eight months or four years and sent to residential placement? Do you understand that?" The respondent answered: "Yes." The court then stated: "There is an agreement that you be committed to DCF for a period not to exceed eighteen months for direct placement. If, during the time—do you understand that if—you're going to go to residential placement for a period of eighteen months. Prior to the end of the eighteen month period DCF can ask to extend your commitment for an additional eighteen months. If that happens, you have a right to object to the extension, request a hearing to contest that, and be represented by an attorney. Do you understand that?" The respondent affirmed: "Yes."

After the canvass, the court found that the plea was "knowingly, intelligently, and voluntarily entered into with the adequate advice and effective assistance of counsel." After accepting the plea, the court concluded that the respondent was "a convicted delinquent having been found guilty of assault on an officer . . . ." In addition, the court recited several procedural facts on the record, including the terms of a motion for out-of-state placement made by DCF. The court stated: "Basically, based on [the respondent's] specialized needs and issues, [her] current placement in detention is not sufficient and that Meadowridge in Massachusetts is the best place for [her] based on [her] behaviors." The court addressed the respondent and asked: "[I]t's my understanding that you're in agreement with this out-of-state placement and that you'll go, is that correct?" The respondent replied: "Yes." On the basis of the foregoing, the court granted the motion for out-of-state placement of the respondent and committed the respondent to the "care and custody of DCF for direct placement for a period not to exceed eighteen months."

We begin by setting forth the legal principles and standard of review that guide our analysis. "Our cases instruct that we conduct a plenary review of the circumstances surrounding the plea to determine if it was knowing and voluntary. . . . A defendant entering a guilty plea waives several fundamental constitutional rights. . . . We therefore require the record affirmatively to disclose that the defendant's choice was made intelligently and voluntarily." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Fabian A.*, 106 Conn. App. 151, 157, 941 A.2d 411 (2008).

Next, "[a]n overview of the law governing pleas is necessary for our disposition of this issue. A plea of guilty or nolo contendere involves the waiver of several fundamental constitutional rights and therefore must be knowingly and voluntarily entered so as not to violate

due process. . . . These constitutional considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . .

"There is no requirement, however, that the defendant be advised of every possible consequence of such a plea. . . . Although a defendant must be aware of the direct consequences of a plea, the scope of direct consequences is very narrow. . . . The failure to inform a defendant as to all possible indirect and collateral consequences does not render a plea unintelligent or involuntary in a constitutional sense." (Citations omitted; internal quotation marks omitted.) *In re Jason C.*, supra, 255 Conn. 571–73.

"The United States Supreme Court clearly has established that constitutional due process protections apply in the juvenile setting." Id., 576. "Both case law and Practice Book § 30a-4 mandate what a court must address in canvassing a juvenile respondent. In *In re Jason C.*, [supra, 255 Conn. 570–71] our Supreme Court stated that when accepting a plea agreement, due process requires a court to advise a juvenile of possible extensions to the delinquency commitment." (Footnote omitted; internal quotation marks omitted.) *In re Fabian A.*, supra, 106 Conn. App. 158–59. Furthermore, the respondent cites Practice Book § 30a-4, which provides in relevant part: "To assure that any plea or admission is voluntary and knowingly made, the judicial authority shall address the child or youth in age appropriate language to determine that the child or youth substantially understands . . . (3) [t]he possible penalty, including any extensions or modifications . . . ."

In the present case, the court advised the respondent that her adjudication as a delinquent meant that she could be committed to DCF for a period not to exceed four years, that the agreement was to commit her to residential placement with DCF for eighteen months, and that the eighteen month period could be extended. The court further informed the respondent that she had several rights with respect to a possible extension of the commitment, including the right to object, the right to request a hearing, and the right to be represented by an attorney. As argued by the respondent, the court did not discuss the possibility that she could subsequently be transferred from the custody of DCF to DOC.

As noted, due process does not require that the respondent be advised of every possible consequence of a plea. Instead, the respondent must be advised of every possible *direct* consequence of a plea, such as commitment to DCF and residential placement. Furthermore, the failure to inform a juvenile of every possible indirect consequence of a plea does not render such plea unknowing or involuntary. Here, the record amply supports the conclusion that the court thoroughly

explained the direct consequences of the respondent's plea and gave her the opportunity to ask questions. Transfer to DOC pursuant to § 17a-12 (a) is not a direct consequence of the respondent's delinquency adjudication. Rather, her adjudication as a delinquent placed her in a category of juveniles who could be made subject to the statute's transfer provisions subject to the happening of events within her control and subsequent to her plea. We believe that such a contingency is sufficiently attenuated from the direct consequences of the respondent's plea and attendant adjudication that the court has no constitutionally based obligation to canvass the juvenile as to the transfer statute's potentialities. As a result, the respondent fails in her claim that her plea was not knowing and voluntary.

IV

Having determined that the respondent's due process rights were violated on the ground that DCF failed to prove, by clear and convincing evidence, its entitlement to have the respondent transferred from its care to the supervision of DOC pursuant to § 17a-12 (a), our inquiry would normally turn to discerning the appropriate remedy to re-enfranchise the juvenile with the rights she was denied. In such a circumstance, this court would, as a matter of course, remand the matter for a new hearing with direction to afford the respondent the protections we have embedded in § 17a-12 (a) in order to preserve its constitutionality. In this particular case, however, because the respondent is back in the custody of DCF and will reach the age of majority during this calendar year, we are unable to provide her with any practical relief from the court's transfer order.

The judgment is reversed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] In making this assertion, the respondent apparently reasons that if her plea to the delinquency charge was not knowing and voluntary, then she is not properly in the custody of DCF as a juvenile delinquent and, therefore, the transfer statute should not be applicable to her.

[2] In general, the term "transgender female" refers to a person whose assigned sex at birth was male but who identifies as female. See United States Department of Justice, National Institute of Corrections, "Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender, and Intersex Persons in Custodial Settings," (August, 2013) p. 49, available at https://s3.amazonaws.com/static.nicic.gov/Library/027507.pdf (last visited June 5, 2015) (copy contained in the file of this case in the Appellate Court clerk's office).

[3] The record reveals that the respondent pleaded guilty to an underlying charge of a violation of § 53a-167c, assault of public safety, emergency medical, public transit or health care personnel.

[4] DCF's motion to transfer the respondent requested that she be sent to Manson, which is an institution for young *male* offenders run by DOC. Because the respondent identifies as a female and not as male, the court ordered her transferred to Niantic, a correctional institution for female offenders. Niantic is Connecticut's only DOC institution for female offenders.

[5] The respondent was transferred to the York Correctional Institution in

Niantic on April 8, 2014, and remained at that facility until June 24, 2014, when she was transferred to the new secure female unit at the Solnit South Facility, operated by DCF. Because the York Correctional Institution is commonly referred to as Niantic, we shall use that term when referring to the York Correctional Institution unless we are repeating verbatim what has been stated elsewhere.

On July 13, 2014, the respondent was transferred back to the Connecticut Juvenile Training School. On its home page, the training school is described as a secure facility for boys adjudicated as delinquent and committed to DCF. Additionally, we note the statutory mandate that: "On or after May 21, 2004, no female child committed to the Department of Children and Families shall be placed in the Connecticut Juvenile Training School. . . ." General Statutes § 46b-140 (k). Nevertheless, the legality of the respondent's placement by DCF in a facility exclusively for males during this appeal has not been raised as an issue for our consideration.

[6] Two additional statutes are important to note, as they have the potential to impact the placement of a delinquent juvenile once transferred pursuant to § 17a-12 (a). The first, General Statutes § 18-87, pertains to the authority of DOC to make an intra-department transfer and provides in relevant part: "The Commissioner of Correction may transfer any inmate of any of the institutions of the Department of Correction to any other appropriate state institution with the concurrence of the superintendent of such institution or to the Department of Children and Families when the Commissioner of Correction finds that the welfare or health of the inmate requires it. . . ."

The second statute, General Statutes § 17a-13, pertains to DCF's ability to bring a delinquent juvenile back into its custody after the juvenile has been transferred to DOC. Section 17a-13 provides: "Any person committed to the Department of Children and Families who is transferred to the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution, Niantic, pursuant to section 17a-12 shall be deemed, while so transferred, to be under the jurisdiction of the Department of Correction except that the Commissioner of Children and Families shall retain his powers to remove such person and to place him in another facility or in the community or to terminate the commitment. The jurisdiction of the Department of Correction shall terminate upon the expiration of the commitment as provided in subsection (a) of section 17a-8."

[7] DCF qualifies its concession by suggesting that only the vagueness claim is reviewable under the "capable of repetition, yet evading review" exception. Our review of whether the issues presented on appeal are moot is not sculpted by the parties' assertions or concessions.

[8] To be sure, the term "dangerous," without refinement, could be held to encompass the behavior of a juvenile who, by such conduct, presents a moral danger to other juveniles unaccompanied by any physical threat.

[9] Although the statute, by plain language, could pertain to any juvenile over fourteen years old who is in DCF custody, whether as a result of being adjudicated as delinquent or through no fault of the juvenile, such as by having been neglected or abandoned or having his or her parents' rights terminated, we need not discuss, in a vagueness as applied analysis, whether the reach of the statute constitutionally extends beyond those committed as a result of delinquency adjudications because the respondent herein was committed as a delinquent.

[10] The term "post-*Gault*" means cases decided after *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). In *In re Gault*, the United States Supreme Court ruled that although a juvenile delinquency hearing need not "conform with all of the requirements of a criminal trial or even of the usual administrative hearing, [such a] hearing must measure up to the essentials of due process and fair treatment." (Internal quotation marks omitted.) Id., 30.

[11] Indeed, the respondent's claim for a jury trial may find some support in our Supreme Court's discussion of a transfer made under a predecessor statute. In the matter of *In re Appeal of Bailey*, 158 Conn. 439, 262 A.2d 177 (1969), our Supreme Court responded to a certified question of whether the statute that (then) permitted a transfer from the Connecticut School for Boys to the Connecticut Reformatory was unconstitutional because it allowed for the commitment of a person to a penal institution without first having a criminal conviction. Part of the argument presented in *In re Appeal of Bailey* was that the juvenile there had not been afforded a trial by jury. Id., 443. In rejecting the juvenile's claim, the court relied, primarily, on its determination that the juvenile had not proven that the reformatory was a penal institution. Id., 451.

In the case at hand, DCF cannot make such a claim. On its website, the York Correctional Institution at Niantic defines itself as a "high-security facility . . . the state's only institution for female offenders." State of Connecticut Department of Correction, "York Correctional Institution," (last modified February 25, 2015), available at http://www.ct.gov/doc/cwp/view.asp?q=265454 (last visited June 5, 2015) (copy contained in the file of this case in the Appellate Court clerk's office). The Manson Youth Institution represents that it is "a level 4 high-security facility. It serves as the Department's primary location for housing sentenced inmates under the age of 21." State of Connecticut Department of Correction, "Manson Youth Institution," (last modified October 20, 2014), available at http://www.ct.gov/doc/cwp/view.asp?a=1499&Q=265428&docNav=| (last visited June 5, 2015) (copy contained in the file of this case in the Appellate Court clerk's office). That both Manson and Niantic are penal institutions cannot reasonably be challenged.

[12] Although we need not elucidate the factors involved in determining the juvenile's best interest, they must include, at a minimum, a consideration of the juvenile's specific physical conditions of confinement; the extent to which any programs of guidance and rehabilitation will be made available to the juvenile while in DOC custody; and the individual needs and circumstances of the juvenile.